22-1481 (L)
*United States v. Kelly*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term 2023

(Argued: March 18, 2024     Decided: February 12, 2025)

Docket Nos. 22-1481 (L), 22-1982 (CON)

_____

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ROBERT SYLVESTER KELLY, AKA R. KELLY,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

_____

Before:     CHIN, CARNEY, and SULLIVAN, *Circuit Judges.*

_____

Appeal from a judgment of the United States District Court for the

Eastern District of New York (Donnelly, *J.*) convicting defendant-appellant, a

recording artist and singer, of racketeering and Mann Act violations. Defendant-

appellant challenges his convictions on several grounds, including the

sufficiency of the evidence, the constitutionality of state laws underlying his

federal convictions, the empaneling of certain jurors and ineffective assistance of

counsel during *voir dire*, and purported errors in the district court's evidentiary

rulings and restitution orders.

  AFFIRMED.

  Judge Sullivan concurs in part and dissents in part in a separate

opinion.

———————————————

     KAYLA C. BENSING, Assistant United States Attorney
      (Nicholas J. Moscow and Lauren H. Elbert,
      Assistant United States Attorneys, *on the brief*), *for*
      Breon Peace, United States Attorney for the
      Eastern District of New York, Brooklyn, NY, *for*
      *Appellee*.

     JENNIFER BONJEAN (Ashley Cohen, *on the brief*), Bonjean
      Law Group, PLLC, Chicago, IL and New York,
      NY, *for Defendant-Appellant*.

CHIN, *Circuit Judge*:

  Defendant-appellant Robert Sylvester Kelly, a recording artist and

singer also known as R. Kelly, appeals from a final judgment entered in the

United States District Court for the Eastern District of New York (Donnelly, *J.*),

2

following a six-week jury trial, convicting him of racketeering in violation of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1962(c), and transportation and coercion in violation of the Mann Act, 18 U.S.C.

§§ 2421(a), 2422(a), 2422(b), and 2423(a).  Enabled by a constellation of managers,

assistants, and other staff for over twenty-five years, Kelly exploited his fame to

lure girls and young women into his grasp.  Evidence at trial showed that he

would isolate them from friends and family, control nearly every aspect of their

lives, and abuse them verbally, physically, and sexually.

On appeal, Kelly challenges primarily (1) the sufficiency of the

evidence supporting his racketeering and Mann Act convictions, including the

underlying state and federal violations upon which they are predicated; (2) the

constitutionality of certain of those underlying state laws; (3) the empaneling of

four jurors who were allegedly biased against him; (4) the district court's rulings

on the admission of certain evidence at trial; and (5) its order of restitution and

the seizure of funds in his Bureau of Prisons ("BOP") inmate account.  We

conclude that (1) there was sufficient evidence to support each of Kelly's

convictions, including for the state and federal violations underlying his Mann

Act convictions; (2) the New York state law -- upon which some of the Mann Act

violations were predicated -- was constitutional as applied to Kelly and Kelly's

challenges to the California state law -- upon which some of the other Mann Act

violations were predicated -- are untimely; (3) the evidence did not support

Kelly's claim that the four jurors Kelly challenges were biased against him or that

trial counsel was ineffective during *voir dire*; (4) the district court did not abuse

its discretion in admitting certain evidence; and (5) the district court did not

abuse its discretion in ordering restitution and the seizure of Kelly's BOP inmate

account funds.  Accordingly, the judgment of the district court is AFFIRMED.

## BACKGROUND

### I.    The Facts[1]

Following Kelly's initial indictment in June 2019, a federal grand

jury returned a third superseding indictment (the operative "indictment") on

March 12, 2020, charging Kelly with nine counts.  Count One charged Kelly with

racketeering in violation of 18 U.S.C. § 1962(c) and set forth fourteen racketeering

acts as to six victims.  Counts Two through Nine charged Kelly with violations of

the Mann Act, 18 U.S.C. §§ 2421-2424.  The racketeering acts in Count One and

---

[1]    Because Kelly appeals his convictions following a jury trial, "our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor."  *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016) (quoting *United States v. Dhinsa*, 243 F.3d 635, 643 (2d Cir. 2001)).

the underlying unlawful conduct in Counts Two through Nine were predicated on various federal and state laws, including, as relevant to this appeal: (1) 18 U.S.C. § 1589(a) (forced labor), (2) California Health and Safety Code ("CHSC") § 120290 (effective 1998) (willful exposure of a communicable disease), (3) New York Penal Law ("NYPL") § 120.20 (reckless endangerment), and (4) New York Public Health Law ("NYPHL") § 2307 (knowing exposure of infectious venereal disease). The evidence presented at trial established the following facts.

## A. Kelly's Inner Circle

Kelly is an internationally-recognized musician and performer. His career took off in the late 1980s. By the 1990s, Kelly employed a network of associates consisting of managers, an accountant, recording engineers, personal assistants, drivers, and runners. Kelly's inner circle worked not only to promote his music and professional brand, but also to enable him to exploit his fame and influence to sexually, physically, and verbally abuse a number of victims, many of whom were minors.

### 1. The Members of Kelly's Inner Circle

Demetrius Smith, one of Kelly's first employees, met Kelly in 1984 when Kelly was a "youngster" performing at a high school talent show in

Chicago.  Kelly App'x at 558-60.  Smith worked as Kelly's personal assistant and tour manager from 1984 to approximately 1996, helping Kelly secure his first record deal.  At that time, Kelly employed Barry Hankerson as his business manager.  Between 2003 and 2011, Tom Arnold also served as Kelly's studio and road manager.  Derrel McDavid eventually took over for Hankerson.  In 2004, Diana Copeland began working as Kelly's personal assistant and later became his executive assistant, spending about fifteen years total working for Kelly.

Kelly employed several runners, including Nicholas Williams and Anthony Navarro, who completed miscellaneous errands for Kelly and his entourage.  Later in his career, Kelly employed additional associates and personal assistants, including Cheryl Mack and two sisters, Suzette and Alesiette Mayweather.

In many respects, Kelly's staff had the responsibilities expected of individuals working for an internationally famous singer and recording artist. For instance, Navarro, a runner, worked at the recording studio in the basement of Kelly's home in the Chicago suburbs.  Navarro's duties included setting up the studio for recording sessions, running errands, and assisting higher-level staff.

Arnold, Kelly's road manager, was responsible for maintaining the tour buses and coordinating travel to Kelly's shows.

### 2. *Kelly's Staff Facilitated the Abuse of Victims*

There was, however, another aspect to the activities of Kelly's inner circle. Kelly's associates and employees made possible his decades-long operation to recruit and exploit young girls and women by enabling, facilitating, and shielding Kelly's abusive behavior from view.

First, at Kelly's direction, members of his entourage handed out Kelly's phone number on slips of paper to young girls Kelly saw at concerts and in public places. Once Kelly began communicating with a girl by phone, FaceTime, or text message, he (or one of his associates) would invite her to visit him, often at his home or studio. Sometimes, Kelly sent an employee to pick up the girl. Upon arrival, a member of Kelly's staff was usually there to receive the guest, and Kelly would instruct his staff on where to take her.

Kelly's employees were his eyes and ears in his studios, residences, and on the road, helping him to enforce the strict rules he had in place for his guests. They stood guard when Kelly confined his victims to a room or bus for hours or days on end as punishment for breaking his rules. When one victim,

Anna, left Kelly's home without permission after an argument, Kelly confronted

Copeland, who was then his personal assistant, about how she had let Anna

leave. *Id.* at 1069.

Beyond what was required to enforce his rules and communicate his

demands and instructions, Kelly instructed his employees not to speak to his

female guests. Kelly's employees knew that he abused girls, both verbally and

physically. For instance, Navarro overheard Kelly verbally abusing female

guests, and Suzette Mayweather heard Kelly hit another victim, Jane, on at least

one occasion.

Kelly's employees knew, or at the very least turned a blind eye to,

the fact that Kelly's female guests were often minors. Navarro recalled that the

girls Kelly invited to the studio "looked really young." *Id.* at 471. Navarro was in

his early twenties at the time, and the girls looked "younger than [he did]" -- "like

mid-aged teenagers." *Id.* at 471-72. Williams, another runner who was nineteen

years old when he worked for Kelly, thought the girls looked "very young." *Id.*

at 1407.

Kelly's employees were responsible for arranging travel for the

female guests to see Kelly, and in doing so would review the girls' identification.

When Arnold booked travel, he used the girls' "name[s] as [they] appear[ed] on their ID and date of birth." *Id.* at 677. Cheryl Mack booked travel for Jane when she was a minor. Jane, who admitted at trial that she had been concealing her true age from Kelly, provided her real identification and birthdate to Mack. Suzette Mayweather later learned that Jane was seventeen years old and, so far as the record shows, did not say anything. Juice, one of Kelly's live-in girlfriends, also learned that Jane was seventeen.

Members of Kelly's inner circle also knew that Kelly had a sexually transmitted disease ("STD"). Dr. Kris McGrath was Kelly's primary care physician for approximately twenty-five years beginning in 1994. As early as February 1995, after Kelly had contracted gonorrhea, Dr. McGrath advised Kelly to disclose his STD status to partners and practice safe sex. Although Dr. McGrath could not remember the precise date that Kelly contracted herpes, prescription records indicate that Dr. McGrath was treating Kelly for genital herpes by March 19, 2007. Kelly had runners pick up his herpes medication from the pharmacy. When Anna got tested for STDs, the doctor sent the results directly to Copeland (Kelly's personal assistant). Juice, at Kelly's instruction, booked a doctor's appointment for another victim, Jane, when Jane began to

experience herpes symptoms, and accompanied Jane to fill prescriptions for her treatment regimen.

Employees faced consequences when they did not follow Kelly's rules: if Kelly determined that a staff member broke a rule or otherwise disobeyed him, he would withhold their pay as a fine. He required several members of his inner circle to write letters falsely incriminating themselves as blackmail material. And Kelly was not above threatening his staff to keep them in line. For example, after informing Mack of a lawsuit filed against him by a seventeen-year-old girl, Kelly told Mack that she had to "pick a team" and that "in these types of situations people come up missing." Sealed App'x at 1945.

Kelly and his staff abided by a strict set of rules with respect to his control over the young girls he invited to his home, studio, and tours. The rules ensured that he controlled virtually every detail of their lives while they were with him. Kelly required girls to wear baggy clothing around him. He made girls call him "Daddy," *see, e.g.*, Gov't App'x at 826 (Stephanie's testimony), and forbade them from talking to other men. Girls needed permission to move around Kelly's residence or studio and even to use the bathroom. Likewise, girls were required to stay inside Kelly's van when travelling around Chicago. Kelly

10

also required girls to write letters attesting to things that they had never done, like stealing and lying, so that he could use the letters as blackmail and leverage. Kelly subjected his victims to humiliating, degrading, and often coerced sexual intercourse. For instance, he dictated how he wanted them to position their bodies during sex, forced one victim to perform oral sex on him with other people in the car, and demanded another victim to spread urine and feces on her naked body while calling him "Daddy." Kelly also sought to punish the victims by demanding that they record humiliating videos: on one occasion, Kelly instructed Juice to procure a new iPad so that Jane could use it to film herself eating feces as punishment. He also did not tell his victims that he had herpes, and did not use a condom during sexual intercourse. Several of his victims contracted herpes after their sexual contact with Kelly.

B.  *The Victims*

The indictment referenced six victims. Because five are directly relevant to the appeal, we provide more detail on those individuals -- Aaliyah, Stephanie, Jane, Jerhonda, and Faith.[2]

---

[2]  The sixth victim, Sonja, testified that Kelly invited her to his studio where she was "detained in a room for days." *United States v. Kelly*, 609 F. Supp. 3d 85, 113 (E.D.N.Y. 2022). At the conclusion of trial, the jury found that, with respect to Sonja, the government did not prove the kidnapping and Mann Act violations beyond a reasonable doubt. *Id.*

### 1. Aaliyah

Kelly met Aaliyah in 1992 through Hankerson -- his manager and Aaliyah's uncle -- when she was at most thirteen or fourteen years old. Kelly and Aaliyah began working together on music and spent an increasing amount of time alone with each other. At some point, Smith asked Kelly if he was "messing" with Aaliyah, which Kelly denied. Kelly App'x at 583.

In the middle of a 1994 tour, before taking the stage to perform, Kelly told Smith that "Aaliyah's in trouble, man, we need to get home." *Id.* at 585-86. On the plane back to Chicago, Smith learned that Kelly was rushing home because Aaliyah thought she was pregnant. Kelly told Smith that he and McDavid were planning for Kelly to marry Aaliyah. Smith came up with the idea of procuring a false identification card for Aaliyah, who was underage and could not legally marry. The group drove to a welfare office in Chicago, where Smith bribed a city clerk with $500 to create a false identification card. The group created another identification card for Aaliyah which falsely stated that she worked at a FedEx. Kelly and Aaliyah went to City Hall and obtained a marriage license using Aaliyah's false identification cards. A preacher married them at a hotel in a hasty ceremony.

2.     *Stephanie*

Stephanie met Kelly in 1998, when she was sixteen years old, at the flagship McDonald's in downtown Chicago.  A member of Kelly's entourage approached Stephanie, who was there on a double date with her boyfriend and another couple.  The man asked Stephanie's age, and she responded truthfully that she was sixteen.  The man handed Kelly's number on a slip of paper to Stephanie, gestured toward Kelly, who was looking at Stephanie from a distance, and told Stephanie that Kelly wanted her to call him.  She threw the paper away because she did not intend to call Kelly.

Stephanie encountered Kelly for a second time a year later.  They began talking, and Kelly invited Stephanie to the studio, saying he would like to get to know her.  Within a couple of weeks, Stephanie visited the studio, where an employee escorted her to a waiting area.  Kelly picked Stephanie up and initiated sexual intercourse.  Stephanie and Kelly continued to see each other six to eight times per month for a period of approximately six months.  They had sex every time they saw each other, and Kelly sometimes video recorded their sexual activity.  Stephanie eventually did not want to see Kelly anymore because their sexual encounters made her feel "used and humiliated and degraded."  Gov't

13

App'x at 850.  She did, however, attempt to convince Kelly to turn over or destroy the video recordings he had made -- he never did.

### 3.      *Jerhonda*

As a devoted fan and active member of Kelly's online fan club, Jerhonda met Kelly outside of federal court in Chicago where Kelly was facing criminal charges in 2008 and where some fans had gathered.  In May 2009, one of Kelly's associates, Bubba (Jermaine Maxey), invited Jerhonda and a friend from the online fan club to come to a party at Kelly's home.  During the party, Jerhonda and Kelly exchanged numbers.  At that time, Jerhonda was only sixteen years old, though she lied and told Kelly she was nineteen.

A couple of days later, Jerhonda returned to Kelly's house after he invited her via text message.  Navarro picked Jerhonda up from the train station. Upon her arrival, Kelly told Jerhonda, who had packed a two-piece swimsuit at his instruction, that he would meet her in his indoor pool room.  At the pool, Kelly instructed Jerhonda to walk back and forth in front of him and remove one piece of her swimsuit each time.  Jerhonda "did what [she] was told."  Kelly App'x at 115.  Once she was naked, Kelly "grabbed" Jerhonda and began kissing

her.  *Id.* at 116.  He then picked her up and took her to his game room, where he performed oral sex on her.  *Id.*

Jerhonda began to feel uncomfortable, which prompted her to tell him that she was sixteen years old.  Kelly told Jerhonda to tell everyone she was nineteen and to "act 21."  *Id.* at 117.  Jerhonda then performed oral sex on Kelly, and Kelly told Jerhonda that he was going to "train [her] on how to please him sexually."  *Id.*  Jerhonda and Kelly then had sex, and he did not use a condom or tell Jerhonda about any STDs that he had.  Sometime during their roughly six-month relationship, Jerhonda contracted herpes.  Kelly arranged for a doctor to see Jerhonda in his home.

Kelly also introduced Jerhonda to Juice, a "girlfriend" who "ha[d] been around since she was [fifteen] years old."  *Id.* at 158.  During their first interaction, Kelly brought Jerhonda onto his tour bus, where Juice was inside and naked.  Kelly told Jerhonda that Juice was going to train Jerhonda on how to sexually please him and that Jerhonda should follow Juice's lead.  He then instructed both Juice and Jerhonda to perform oral sex on him.

The last time Jerhonda was in Kelly's home, Kelly became angry at her for not acknowledging him when he walked into a room.  He slapped her

and choked her until she lost consciousness, and when she got up, he spit on her and told her to put her head down in shame. Once she got up off the floor, Kelly instructed Jerhonda to perform oral sex on him, and she complied.

    4.    *Jane*

Jane first met Kelly during one of his concerts in April 2015, when she was seventeen years old. At some point during the show, a member of Kelly's entourage handed Jane a slip of paper with Kelly's phone number on it and instructed her not to tell anyone. Sometime later, Kelly contacted Jane over FaceTime and invited her to audition for him as an aspiring R&B singer. Jane, who was seventeen at the time, lied and told Kelly she was eighteen.

Kelly asked Jane to meet him at the Dolphin Hotel in Kissimmee, Florida, for her audition. Once inside the hotel room, Kelly told Jane that "before [she could] audition[,] he needed to cum." *Id.* at 454. Jane told him that she was not there to please him and that she was there to audition. Undeterred, Kelly instructed Jane to remove her clothing. Following Kelly's multiple requests to have sex with her, Jane ultimately allowed him to perform oral sex on her because she "thought it would be better than having [vaginal] sex with [Kelly]," *id.* at 456, and he promised, in return, to "allow [her] to audition," *id.* at 457.

After ejaculating, Kelly permitted Jane to perform a musical audition, at which point he indicated that she "had a lot of potential" and offered to help Jane improve her singing. *Id.* at 460.

Jane proceeded to travel to Los Angeles to see Kelly perform on tour, and Kelly had Cheryl Mack arrange Jane's travel. When providing her information so that Mack could book travel, Jane gave Mack her real birthdate. Jane saw Kelly at his hotel in Los Angeles. He again told her that he "wanted to teach [her] a few [musical] techniques," but that he "needed to ejaculate again before doing anything." *Id.* at 469. Kelly then performed oral sex on Jane in the Los Angeles hotel.

Later, Kelly arranged for Jane to meet him in Stockton, California. Mack again booked Jane's travel using Jane's real birthdate. In Stockton, Jane and Kelly had sexual intercourse for the first time. Kelly did not use a condom or tell Jane that he had herpes. In May 2015, Mack arranged for Jane to meet Kelly in San Diego, California, where the two had sexual intercourse again without the use of a condom and without Kelly disclosing that he had herpes.

Jane spent the summer after her junior year of high school in Chicago with Kelly. While spending time in Kelly's studio, Jane needed his or an

assistant's permission to leave her room.  Jane travelled with Kelly while he was on tour that summer, and the two had sex "almost every day."  *Id.* at 509.  Kelly often recorded their sexual encounters on his iPad.

When she was still seventeen, Jane contracted herpes.  She began experiencing pain during sexual intercourse, and her symptoms became so severe that she could not walk.  Kelly directed Juice to book a doctor's appointment for Jane.  When Jane told Kelly that she had contracted herpes, he became "agitated and said that [she] could have gotten that from anyone."  *Id.* at 518.  Jane responded that she "had only been intimate with him."  *Id.*

At the end of that summer, before returning home to Florida, Jane told Kelly that she was seventeen years old.  Kelly and Jane were in Lincoln Park, Chicago, with Juice and one of Kelly's drivers when she told him.  In response to the news, Kelly slapped Jane in the face with his open palm and walked away.

            5.      *Faith*

Faith met Kelly when she was nineteen years old, after members of Kelly's staff invited her and her sister backstage during a March 2017 concert in San Antonio, Texas.  Kelly gave Faith his phone number, and when she got home from the concert, she texted her name and a photo of herself to Kelly.  Faith and

Kelly thereafter started communicating via text, phone, and FaceTime.  Kelly told

Faith he loved her within a week of their first meeting.  He invited Faith to come

see him on tour and gave her Diana Copeland's phone number for travel

arrangements.

In May 2017, Faith made her first trip to New York to see Kelly.

Kelly visited Faith's hotel room the morning after she arrived and they had

sexual intercourse, even though Faith told Kelly that she was not ready for sex.

Kelly recorded the encounter on his iPad.  Kelly did not disclose his herpes

diagnosis to Faith or use a condom.  Several months later, when Faith travelled

with Kelly to Dallas, he directed her to "write . . . something about [her] family

that [she] didn't want anybody to know," which he could use to protect himself.

*Id.* at 1718.  Kelly also instructed Faith to send a text message that said, "Daddy I

want to be with you and the girls."  *Id.* at 1718.

## II.    *Proceedings Below*

Before trial, the district court prepared a written questionnaire

containing 108 questions for jury selection.  Approximately 575 prospective

jurors completed and returned the questionnaire.  After reviewing the

questionnaires, the parties agreed that 251 prospective jurors should be struck for

19

cause.  Each party then separately challenged additional prospective jurors:

Kelly's counsel challenged an additional 145 individuals; the government listed

an additional 34.  The district court excused all of these individuals before

conducting *voir dire*.  The remaining 145 underwent in-person *voir dire*, which

began on August 9, 2021, and took two days.  The court empaneled twelve jurors

and six alternates.[3]

Trial commenced on August 18, 2021.  Over the course of the six-

week trial, the government presented forty-five witnesses and hundreds of

exhibits, including written and videotaped evidence of Kelly's treatment of his

alleged victims.  After the government rested, the defense called five witnesses.

Kelly did not testify.

On September 27, 2021, the jury returned a verdict of guilty on all

counts.  The jury determined that the government proved all the underlying

racketeering acts in Count One except Racketeering Acts Three and Four

(kidnapping and Mann Act violations as to Sonja).  After trial, Kelly moved for a

judgment of acquittal and alternatively for a new trial under Federal Rules of

---

[3]     No jurors were excused, and thus no alternate juror was asked to deliberate.

Criminal Procedure 29 and 33.  On June 29, 2022, the district court denied both

motions.  *See United States v. Kelly*, 609 F. Supp. 3d 85 (E.D.N.Y. 2022).

The district court sentenced Kelly on June 29, 2022, as follows: 360

months' imprisonment on Count One, ten years on each of Counts Two, Six, and

Eight, and twenty years on each of Counts Three, Four, Five, Seven, and Nine, all

to run concurrently, followed by a five-year term of supervised release.  The

court also imposed a $100,000 fine; a $40,000 assessment under the Justice for

Trafficking Victims Act ("JTVA"), 18 U.S.C. § 3014; and a $900 special assessment.

On August 4, 2022, the government directed the BOP to seize

$27,824.24 in Kelly's inmate trust account.[4]  The government then moved for "an

order requiring the BOP to turn over the funds to the Clerk of Court for deposit

into an interest-bearing account."  Sp. App'x at 158 (internal quotation marks

omitted).  The government sought these funds "either to satisfy [Kelly's]

restitution judgment, which [was] yet to be imposed, or to satisfy the Court-

ordered fine, which ha[d] already been imposed."  *Id.* at 161 (internal quotation

marks omitted).  On September 9, 2022, the district court granted the motion.

---

[4]     Kelly had been arrested approximately three years earlier, on July 11, 2019.

After briefing and a hearing, the district court imposed restitution in the amount of $379,649.90 as to two victims: Jane ($300,668.18) and Stephanie ($78,981.72).

This appeal followed.

## DISCUSSION

On appeal, Kelly challenges virtually every aspect of his trial and sentence, arguing that (1) there was insufficient evidence to support the RICO and the Mann Act convictions, including the underlying violations of NYPL § 120.20 and the federal forced labor statute, 18 U.S.C. § 1589(a); (2) two state laws underlying the RICO and Mann Act violations are unconstitutional or were improperly applied; (3) the court empaneled four jurors who were biased against him and trial counsel was ineffective for failing to seek their dismissal; (4) the district court improperly admitted evidence under Federal Rule of Evidence 404(b); and (5) the district court abused its discretion in (a) ordering restitution as to Jane and Stephanie and (b) authorizing the seizure of funds from Kelly's BOP account.  We address each issue in turn.

## I.      Sufficiency of the Evidence

Kelly first contends that there was insufficient evidence to support

his convictions under RICO (Count One) and the Mann Act (Counts Two through Nine).  He also challenges the sufficiency of the evidence of the underlying predicates of his RICO and Mann Act convictions – namely, violations of NYPL § 120.20 (reckless endangerment) and the federal forced labor statute, 18 U.S.C. § 1589(a).  We conclude that the evidence was sufficient as to all counts.

### A.    *Standard of Review*

We review preserved sufficiency of the evidence claims *de novo*. *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021).  A defendant challenging the sufficiency of the evidence "faces an uphill battle," *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (internal quotation marks omitted), and "bears a heavy burden," *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009), because a reviewing court must sustain the jury's verdict if, viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Construing the evidence in the prosecution's favor means that we "defer to the jury's assessment of witness credibility and its assessment of the

weight of the evidence." *United States v. Lewis*, 62 F.4th 733, 744 (2d Cir. 2023) (internal quotation marks omitted). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Capers*, 20 F.4th at 113 (internal quotation marks omitted).

**B.    *The RICO Conviction***

Kelly argues that there was insufficient evidence to support his RICO conviction because the government failed to prove that (1) the enterprise had an illegal common purpose, and (2) the enterprise was distinct from Kelly. We disagree.

*1.    Applicable Law*

The RICO statute provides, in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To prove a criminal RICO violation, the government must prove "an enterprise and a pattern of racketeering activity." *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021).

A RICO enterprise includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," *United States v. Turkette*, 452 U.S. 576, 583 (1981), and has three basic features: (1) "a purpose"; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit [the] associates to pursue the enterprise's purpose," *Boyle v. United States*, 556 U.S. 938, 946 (2009).

In keeping with the principle that courts should "liberally construe[]" the RICO statute, the Supreme Court has noted that "[t]he term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Id.* at 944 (citations omitted); *accord D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) ("In line with this general approach, the Supreme Court has rejected attempts to graft onto the statute formal strictures that would tend to exclude amorphous or disorganized groups of individuals from being treated as RICO enterprises." (internal quotation marks omitted)).

In *Turkette*, the Supreme Court held that RICO covers "both legitimate and illegitimate enterprises within its scope; it no more excludes

criminal enterprises than it does legitimate ones." 452 U.S. at 580-81. In so

holding, the Supreme Court emphasized RICO's intentionally broad reach, *id.* at

589, and noted that though "the primary purpose of RICO is to cope with the

infiltration of legitimate businesses," the statute could also be applied to reach

exclusively illegitimate -- or criminal -- enterprises, *id.* at 591.

For a RICO conviction to stand, there must also be a sufficient nexus

between the enterprise and the racketeering activity. *See United States v.*

*Indelicato*, 865 F.2d 1370, 1384 (2d Cir. 1989) (en banc) ("[N]o RICO violation can

be shown unless there is proof of the specified relationship between the

racketeering acts and the RICO enterprise.").

2. *Application*

While Kelly's arguments on appeal are not entirely clear, we

nevertheless understand him to be making two arguments -- one primarily legal

and the other record-based. With respect to the first, Kelly asserts that members

of an enterprise must have a fraudulent or illegal common purpose to be a

cognizable enterprise under RICO. As for the second, Kelly contends that the

government did not prove at trial the illegal purposes alleged in the indictment.

26

*See* Oral Arg. at 4:08-4:26.[5]

   To the extent Kelly argues that the law requires members of an association-in-fact enterprise to have a fraudulent or illegal common purpose, a substantial body of Supreme Court and Second Circuit precedent makes clear that an association-in-fact enterprise need not have a fraudulent or illegal common purpose.  In *Turkette*, the Supreme Court held that RICO covers both legitimate and illegitimate enterprises.  452 U.S. at 580-81.  And in *Boyle*, the Supreme Court endorsed its prior holding in *Turkette*, emphasizing that the definition of a RICO enterprise is "obviously broad" as evidenced by the statute's use of the word "any."  556 U.S. at 944.

   Kelly asserts, without citing authority, that "*Turkette* assumed a RICO enterprise would have *some* criminal objective."  Kelly Br. at 36.  He argues

---

[5] Kelly styled his challenge to his RICO conviction as a sufficiency claim both in his brief and at oral argument.  The government points out that Kelly did not object to the district court's instructions to the jury, which read, in pertinent part:

> The term "enterprise" includes legitimate and illegitimate enterprises.  An enterprise . . . can be a vehicle used by a defendant to commit crimes. . . . A group or association of people can be an enterprise if these people have associated together for a common purpose of engaging in a course of conduct.

Gov't App'x at 903.  Indeed, at oral argument, defense counsel repeatedly emphasized that she was not challenging the jury instructions, and that any such challenge would be "frivolous" because the instructions were a proper articulation of the law.  Oral Arg. at 38:06-38:13; *see also id.* at 1:24-1:32 ("I'm not challenging the jury instruction, nor could the jury instruction be challenged.").

that "*Turkette* never suggested that an enterprise could be established by individuals engaging in a course of conduct with an entirely legal purpose that was unrelated to the alleged racketeering acts of one person in the enterprise." *Id.* (internal quotation marks omitted).  His argument lacks merit for two reasons.

First, we do not read any part of *Turkette* to suggest that a RICO enterprise must always have some criminal objective.  Indeed, the question before the Court in that case was the inverse: whether RICO could cover exclusively *criminal* enterprises.  *See* 452 U.S. at 578.  The Court observed that "[i]t is obvious that § 1962(a) and (b) address the infiltration by organized crime of legitimate businesses."  *Id.* at 584.  Kelly's reading of *Turkette* to say that a RICO enterprise will always have some criminal objective is clearly wrong.

Second, by arguing that the government must prove an illegal course of conduct to prove a RICO enterprise, Kelly blurs the line between the RICO enterprise on the one hand (which need not be inherently criminal) and the pattern of racketeering activity on the other (which necessarily is the course of criminal activity by the enterprise).  The *Turkette* Court expressly anticipated and rejected this line-blurring argument, explaining that:

> In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected

28

> "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity, is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. . . . The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.

*Id.* at 583 (citation omitted). Kelly's argument that the enterprise's purpose was unrelated to the racketeering acts is an argument about the nexus between the enterprise and the pattern of racketeering, but it is not an issue we consider when determining whether a RICO enterprise exists in the first place. *See Indelicato*, 865 F.2d at 1384.

      In support of his claim that individuals in a RICO enterprise must have a fraudulent or illegal common purpose, Kelly principally argues that we are bound by statements made in our decision in *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004). Specifically, he relies on our observation there that "for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such

purposes." *Id.* at 174 (emphasis added) (internal quotation marks omitted and alteration adopted).

Kelly's interpretation of *Satinwood* as setting a heightened standard for RICO enterprises overlooks the context of our discussion in that case. That quoted phrase was ancillary to a discussion regarding the nexus requirement between an enterprise and racketeering activity and was merely dicta. Moreover, the quoted language, if read as a holding, would contradict both *Turkette* and *United States v. Mazzei*, 700 F.2d 85 (2d Cir. 1983).[6] *See Turkette*, 452 U.S. at 580-81 ("There is no restriction upon the associations embraced by the definition[] [of enterprise in Section 1961] . . . . On its face, the definition appears to include both legitimate and illegitimate enterprises within its scope."); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) ("The [Supreme] Court has held that RICO . . . protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'" (internal citations omitted)).

---

[6] In *Mazzei*, we held that proof of a RICO enterprise and pattern of racketeering activity need not be "distinct and independent, as long as the proof offered is sufficient to satisfy both elements." 705 F.2d at 89. The practical effect of *Mazzei* is that the same pieces of evidence can prove the existence of the enterprise and the pattern of racketeering activity. Kelly's reading of *Satinwood* as imposing an additional requirement that the government prove a fraudulent or illegal common purpose distinct from the predicate racketeering acts is squarely contradicted by *Mazzei*.

In light of these cases and the language of the statute, an association-in-fact enterprise need not have an explicitly fraudulent or illegal common purpose to be cognizable as an enterprise under RICO.[7]

      We also reject Kelly's claim that there was no nexus between the enterprise R. Kelly brand and the pattern of racketeering activity. "The requisite vertical nexus between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (internal quotation marks, citations, and emphasis omitted). That is precisely the case here.

      The record is replete with evidence that Kelly was able to commit the predicate acts because he was the head of a close-knit group of associates and

---

[7]    District courts in our Circuit have flagged *Satinwood*'s inconsistency with both Supreme Court and Second Circuit precedent. *See JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, No. 06-CV-6095, 2007 WL 1159637, at *9 (S.D.N.Y. Apr. 18, 2007); *see also Kelly*, 609 F. Supp. 3d at 124-26; *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006) ("[T]here also appears to be no doubt that these same statements [in *Satinwood*] are inconsistent with the holdings of *Mazzei* and its progeny."), *aff'd*, 328 F. App'x 695 (2d Cir. 2009); *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 474 n.86 (E.D.N.Y. 2007) ("[T]he quoted portion of [*Satinwood*] is not well-supported by Second Circuit precedent, as evidenced by the fact that [*Satinwood*] cited only one district court opinion in support of it, and it is flatly inconsistent with *Mazzei* and *Turkette*.").

he controlled the affairs of the enterprise. For instance, members of Kelly's entourage participated directly in a predicate act when they devised a plan for Kelly to marry Aaliyah when she was underage. Fearing that Aaliyah was pregnant, Kelly told Smith that he "needed to marry Aaliyah to protect himself," Kelly App'x at 599, and thereafter Smith and McDavid bribed a local clerk to obtain false identification for Aaliyah, in violation of Illinois criminal bribery laws.

Likewise, members of Kelly's entourage helped introduce him to underage girls. With respect to Stephanie, a member of Kelly's entourage approached her at a McDonald's in 1998 and asked her age. Stephanie replied that she was sixteen. Even though Stephanie had disclosed that she was underage, Kelly's associate handed her a slip of paper with a phone number on it and told Stephanie that Kelly -- who was watching the interaction from a distance -- wanted to meet her. Stephanie ultimately met Kelly for the first time in 1999, when she was seventeen years old.

Kelly also directed his staff to facilitate his abuse of girls in violation of the Mann Act. Employees arranged for girls' transportation to locations around the country to engage in sex with Kelly, enforced Kelly's strict rules for

the girls, and coordinated STD treatment for Kelly and his victims.  As an

example, Copeland received Jane's STD test results directly from the doctor, and

runners picked up Kelly's herpes medication.  Juice also knew about Kelly's

herpes and took girls to get tested for STDs.  There is also overwhelming

evidence that Kelly was further enabled to gain access to his victims because of

his fame as a renowned singer and performer, a reputation his associates helped

him maintain.  Indeed, the evidence indicates that Kelly principally relied on his

reputation to entice young girls into his orbit -- he dangled his influence and clout

in the industry to reach his victims.  A rational factfinder could therefore have

found that the government proved the requisite nexus between the RICO

enterprise and predicate racketeering acts.

Kelly's final challenge to his RICO conviction is that the enterprise

was indistinct from him because it "had no function unrelated to [him]."  Kelly

Br. at 38.  A defendant charged under RICO must be distinct from the enterprise,

such that the entity "is not simply the same 'person' referred to by a different

name." *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 161.  Accordingly, we have

rejected civil RICO claims where the defendant is a *corporate entity* and the

enterprise is made up of the corporation's employees acting in the course of their

33

employment.  *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[W]here employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.").

Kelly, however, is not a corporate entity.  "As we have explained, the plain language and purpose of the [RICO] statute contemplate that a *person* violates the statute by conducting an *enterprise* through a pattern of criminality." *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (internal quotation marks omitted).  Kelly, a "natural person," is distinct from the many people at his employ who carried out his -- and his brand's -- affairs.  *See Cedric Kushner Promotions, Ltd.*, 533 U.S. at 161 ("In ordinary English[,] one speaks of employing, being employed by, or associating with *others*, not oneself." (emphasis added)).  Moreover, "the RICO provision . . . applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the *sole owner*." *Id.* at 166 (emphasis added).  We conclude that the need for two distinct entities is satisfied here.  We therefore reject Kelly's sufficiency claim as to the RICO conviction.

C.      *Mann Act Violations*

Kelly argues that there was insufficient evidence that he transported Jane and Faith with the intent of exposing them to herpes, in violation of the Mann Act.  He contends that the illegal nature of the sexual activity was incidental to the trips, and that he can be found to have violated the Mann Act only if he specifically intended to expose them to herpes.  Kelly also argues that he did not coerce or entice Jane or Faith to travel to see him in violation of the Mann Act.  We are not persuaded.

1.      *Applicable Law*

a.      Section *2421*

The Mann Act makes it illegal to "knowingly transport[] any individual in interstate or foreign commerce . . . with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense."  18 U.S.C. § 2421(a).  To prove intent under § 2421(a), the government must establish that a dominant purpose of the travel was to engage the individual in the charged illegal activity.  *See United States v. Miller*, 148 F.3d 207, 212 (2d Cir. 1998) (internal quotation marks omitted).

*b.*     *Section 2422*

Section 2422(a) of the Act makes it illegal to "knowingly persuade[],
induce[], entice[], or coerce[] any individual to travel in interstate or foreign
commerce . . . to engage in . . . any sexual activity for which any person can be
charged with a criminal offense."  18 U.S.C. § 2422(a).  "The words 'attempt,'
'persuade,' 'induce,' 'entice,' or 'coerce,' though not defined in the statute, are
words of common usage that have plain and ordinary meanings."  *United States
v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007).  To determine whether the defendant
had the requisite intent under § 2422(a), which "imposes no requirement that an
individual endeavor to 'transform or overcome' the will of his intended victim,"
the jury need only consider whether the defendant "intended to induce,
persuade, and/or entice" the victim to travel to engage in illegal sexual conduct
with him, "regardless of whether she expressed (or felt) reluctance, indifference,
or, for that matter, enthusiasm at the prospect of doing so."  *United States v.
Waqar*, 997 F.3d 481, 487-88 (2d Cir. 2021) (describing intent under § 2422(b),
which uses language identical to that in § 2422(a)).

36

2.     *Application*

a.     Section *2421*

Kelly argues that any violation of the state laws -- which prohibit exposing sexual partners to venereal diseases -- was merely incidental to the women's travel.  The district court's jury instruction, to which Kelly did not object, read:

> In order to establish this element, it is not necessary that the Government prove that engaging in illegal sexual activity was the only purpose for crossing the state line.  A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey.  The Government must prove beyond a reasonable doubt, however, that a significant or motivating purpose of the travel across a state line was that the defendant would engage in illegal sexual activity with [the victim].  In other words, that illegal activity . . . can't have been merely incidental to the trip.

Gov't App'x at 904.

Kelly contends that the statute requires proof that he specifically intended to expose the girls to herpes, and that a general intent to engage in sexual activity chargeable as a crime would be insufficient.  Kelly misreads the statute.

We start with the plain language of § 2421(a), which requires that Kelly "knowingly" transported Jane and Faith with the "intent" that they "engage

in . . . sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2421(a).  As the district court held, "the government was required to prove that [Kelly] transported Jane and Faith with the intent of engaging in sexual activity with them, and that the intended sexual activity was illegal." *Kelly*, 609 F. Supp. 3d at 134.  Nothing in the statute requires a reading that Kelly was required to also possess the specific intent to expose the girls to herpes.  Even assuming he did not intend to infect them, he intended to have sex with them, and the intended sexual activity was illegal because he knew he had herpes and intended to engage in unprotected sex without disclosing his condition.[8]  We therefore hold that there was sufficient evidence here to show that Kelly transported Jane and Faith across state lines with the intent to have unprotected sex with them in violation of § 2421.

> b.    *Section* 2422

Kelly next argues that the government did not prove that he induced, persuaded, enticed, or coerced either Jane or Faith to travel for purposes of engaging in sexual activity in violation of § 2422(a).  He argues that

---

[8]    It was also illegal under the California law of statutory rape, which made Jane unable to give effective consent.  Cal. Pen. Code § 261.5.  This conduct, too, therefore supported Kelly's convictions for transporting Jane in violation of the Mann Act -- *i.e.*, Counts Two and Five -- as well as the corresponding Racketeering Acts 9A and 9D.

it was Jane and her mother who tricked *him* into spending time with Jane,

without disclosing that she was underage.  Similarly, Kelly argues that because

Faith *was* of age, she could not have been coerced or enticed to travel.

These arguments take the focus away from Kelly and direct the

focus to the intent of Jane and Faith.  The victims' intent, however, is not relevant

to this inquiry.  Indeed, we have explicitly rejected an approach to § 2422 that

"moves the locus of the offense conduct from the intent and actions of the would-

be persuader to the effect of his words and deeds on his would-be victim."

*Waqar*, 997 F.3d at 487.

With a proper focus on Kelly's intent in his interactions with Jane

and Faith, we conclude that there was sufficient evidence for a jury to find that

he coerced and enticed them both to travel to engage in sexual activity for which

Kelly could be charged with a criminal offense.  Kelly argues that he merely

invited Jane to see him, and that Jane's mother orchestrated their relationship.

Even if it is true that Jane's mother helped Jane craft messages and plan her

interactions with Kelly, that does not alter the inferences a rational jury could

make about Kelly's mindset and intent.  A rational jury could -- and did --

conclude from this evidence that Kelly coerced and enticed Jane to have sex with

him using promises of free travel to see him perform and tutelage from him in her own career, and that this conduct accordingly violated § 2422(a).

The same is true for Faith, even though Kelly argues that Faith -- unlike Jane -- was a fully consenting adult woman. The government presented evidence at trial that Kelly told Faith he loved her and encouraged her to visit him while he was on tour. He sent Faith Copeland's number so that Copeland could arrange for Faith's travel. He brought up the topic of her visiting him and encouraged Faith to make plans to do so. While these actions were not, in themselves, illegal, there was ample evidence in the record that Kelly did these things so that he could have sex with Faith in his usual manner -- without disclosing his herpes diagnosis and without using a condom, in violation of state law.

Accordingly, there was sufficient evidence from which a jury could find inducement under § 2422(a). *See United States v. Rashkovski*, 301 F.3d 1133, 1137 (9th Cir. 2002) ("[I]t is not significant that [the victims] had pre-existing wishes to [travel], especially considering that they never acted upon those desires until [the defendant] made it attainable.").

### D. *New York Penal Law § 120.20*

Kelly also challenges the sufficiency of the evidence supporting his violation of NYPL § 120.20, which is the predicate crime upon which two racketeering acts and several Mann Act convictions are based.[9]  Kelly asserts that the government failed to prove a violation of section 120.20 because "unprotected sex with a person who carries the herpes virus does not establish a 'substantial risk of physical injury.'"  Kelly Br. at 59 (quoting N.Y. Penal Law § 120.20).  We disagree and conclude that there was sufficient evidence from which a rational jury could find that Kelly violated section 120.20 based on his sexual conduct with Faith.

### 1. *Applicable Law*

Under New York law, a person is guilty of second-degree reckless endangerment, a class A misdemeanor, "when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." N.Y. Penal Law § 120.20.  Serious physical injury is injury that "causes . . .

---

[9]     The two racketeering acts are Racketeering Acts 12 and 14 of Count One.  The Mann Act convictions are Counts Six through Nine.  All relate to Faith.

protracted loss or impairment of the function of any bodily organ." *Id.*

§ 10.00(10).

2.      *Application*

As the jury heard from experts at trial, herpes is a transmissible

virus that is both highly contagious and, at times, difficult to detect.  The herpes

virus stays in a person's central nervous system forever, and it can reactivate to

cause outbreaks of "blisters, ulcers, pustules, [and] vesicles," which can cause

"numbness" and "severe pain."  *Kelly*, 609 F. Supp. 3d at 137 (alterations adopted)

(quoting testimony of Dr. Iffath Hoskins).  On occasion, but rarely, it can lead to

brain and central nervous system complications.  Jane's herpes symptoms were

so severe at one point that she could not walk.

Kelly did not disclose his herpes diagnosis to sexual partners,

including his victims.  Nor did he use condoms during sex, despite Dr.

McGrath's admonitions to use protection because of his diagnosis.  Kelly also

had a habit of requesting new Valtrex prescriptions even when Dr. McGrath

prescribed him enough medication to last months at a time.  Based on this

evidence, a jury was free to conclude that Kelly engaged in unprotected sex with

his victims without disclosing his herpes infection and was not regularly

42

managing his herpes with medication. A jury could find that in doing so, Kelly created a substantial risk of serious physical injury to the victims by exposing them, including Faith, to genital herpes.

Kelly argues that, because there is no evidence that Faith contracted genital herpes, there is insufficient evidence that he violated section 120.20. This argument is meritless. Section 120.20 criminalizes exposing another person to "substantial risk of serious physical injury." Under the plain language of the statute, it is not necessary that the person be, in fact, injured. The law merely criminalizes the creation of a substantial risk of injury. *See People v. Roth*, 80 N.Y.2d 239, 245 (1992) ("Since the occurrence of an injury is immaterial, the fact that the defendants could not have foreseen the manner in which this injury occurred does not negate their liability under the statute."). There was sufficient evidence from which the jury could have concluded that Kelly recklessly subjected Faith to a substantial risk of bodily harm by having unprotected sex with her and not telling her about his herpes diagnosis.

E.      *Forced Labor*

Kelly was convicted of violations of the Mann Act in connection with Jerhonda and Faith, predicated on his violation of the federal forced labor

statute, 18 U.S.C. § 1589(a). As to both Jerhonda and Faith, Kelly argues that he

merely engaged in consensual "isolated sex act[s]" with each woman and that "no

rational juror could conclude" that Kelly obtained their labor or services through

force in violation of the federal forced labor statute. Kelly Br. at 70-71. His

arguments lack merit considering the evidence adduced at trial.

> 1.    *Applicable Law*

The federal statute prohibiting forced labor, 18 U.S.C. § 1589(a),

requires the government to prove:

> (1) the defendant obtained the labor or services of another person;
> (2) the defendant did so . . . (a) through threats of serious harm to, or
> physical restraint against that person or any other person; or
> (b) through a scheme, plan or pattern intended to cause the person
> to believe that non-performance would result in serious harm to, or
> physical restraint against, that person or any other person; . . . and
> (3) that the defendant acted knowingly.

*United States v. Sabhnani*, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008), *aff'd*, 599 F.3d

215 (2d Cir. 2010).

"[L]abor" is the "expenditure of physical or mental effort especially

when fatiguing, difficult, or compulsory," and "[s]ervice" is "the performance of

work commanded or paid for by another." *United States v. Marcus*, 628 F.3d 36,

44 n.10 (2d Cir. 2010) (quoting *Merriam-Webster's Third New International*

*Dictionary Unabridged* (2002)). Besides showing that a defendant obtained the

labor or services of another person, the government must also establish a causal

link between the labor and services and the serious harm.  "Serious harm" is

> any harm, whether physical or nonphysical, including
> psychological, financial, or reputational harm, that is sufficiently
> serious, under all the surrounding circumstances, to compel a
> reasonable person of the same background and in the same
> circumstances to perform or to continue performing labor or services
> in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).

### 2.    *Application*

The evidence presented at trial was sufficient for a jury to conclude

that Kelly violated the forced labor statute as to Jerhonda and Faith.  Kelly asks

us to focus on what he characterizes as the isolated nature of the sex acts

themselves, arguing that if we allow his convictions predicated on violations of

the forced labor statute to stand, we would be federalizing state law.  We

understand this concern as a general matter, but we need not address the reach

of the forced labor statute at the margins (*i.e.*, whether the statute would cover a

single instance of rape), because this is not a marginal case.

As we have described at length in this opinion, there was extensive

evidence showing how Kelly ensnared young girls and women into his orbit,

endeavored to control their lives, and secured their compliance with his personal

and sexual demands through verbal and physical abuse, threats of blackmail, and humiliation.  A jury was permitted to infer, from this evidence, that Kelly had in place a "scheme, plan or pattern intended to cause the [girls] to believe" that they would be harmed if they did not comply with his sexual demands.  *See Sabhnani*, 599 F.3d at 242 (finding sufficient evidence to support conviction under section 1589 where there was evidence that the defendant witnessed his wife "humiliate" live-in domestic servants, force servants into humiliating and painful punishments, and physically abuse the servants).

There is ample evidence to support the jury's conclusion that Kelly obtained the sexual labor of Jerhonda and Faith during the relevant time periods (in and between May 2009 and January 2010 for Jerhonda; on January 13, 2018, for Faith) through threats of serious harm or physical restraint.  Kelly exerted tremendous psychological and physical control over Jerhonda.  For instance, he required her to write a letter falsely admitting to stealing $100,000 of jewelry and to lying about contracting genital herpes from Kelly.  He hit her when she disagreed with him.  He told her that Juice was going to "train" her on "how to sexually please" him.  Kelly App'x at 158.  He played her a video of them having sex so that he could critique it.  On one occasion, he "slapped" her and choked

her until she lost consciousness; after Jerhonda came to, Kelly instructed her to perform oral sex on him. *Id.* at 169-70.

Faith was also subject to psychological control by Kelly. In Los Angeles, Kelly kept Faith waiting in a room for hours without food or water because she did not greet him properly when he first saw her. When Kelly returned to where Faith was waiting, he instructed her to take her clothes off and "walk back and forth." *Id.* at 765. Faith said that she "didn't want to have sex with him." *Id.* They went to another, smaller room, where there was a gun on the ottoman. *Id.* at 766-67. Kelly then grabbed Faith's neck and guided her into performing oral sex on him as the gun was next to him. *Id.* at 769. Faith testified that she did so because she felt "[i]ntimidated" and that she "was under his rules" because "he had a weapon." *Id.* at 769-71. Accordingly, there was sufficient evidence for a jury to find Kelly guilty of forced labor as to Faith.

## II. *Constitutionality of the State Statutes*

Kelly challenges two state-law convictions that underlie the RICO and Mann Act convictions, arguing, *inter alia*, that the laws are unconstitutionally vague. Specifically, he claims that (1) the government failed to prove that Kelly was "infected" within the meaning of NYPHL § 2307; (2) section 2307 is

unconstitutionally vague; (3) the government improperly indicted Kelly under the 1998 version of CHSC § 120290; and (4) section 120290 is also unconstitutionally vague.  We disagree with his first two arguments and find that his third and fourth arguments are untimely.

The Due Process Clause of the Fourteenth Amendment requires that every criminal statute "(1) give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, and (2) provide explicit standards for those who apply the statute."  *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010) (internal quotation marks omitted and alterations adopted).  A statute presents vagueness concerns if it does not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

Moreover, when, as here, "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'"  *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (en banc) (quoting *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993)).

"Because 'a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,' we will uphold a statute against an as-applied challenge if 'the particular enforcement at issue is consistent with the core concerns underlying the statute.'" *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (alterations adopted) (first quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982); and then quoting *Dickerson*, 604 F.3d at 748). Thus, a defendant who brings a facial challenge to a criminal statute that does not touch on First Amendment rights will fail unless he can establish "that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### A.   *Standard of Review*

Where a vagueness challenge is not raised before the district court, we review for plain error on appeal. *Rybicki*, 354 F.3d at 129. "We typically do not find plain error 'where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court.'" *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (quoting *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004)).

49

**B.**     *New York Public Health Law § 2307*

Kelly's challenge to NYPHL § 2307 need not detain us long.  He contends that the government presented "*no* evidence . . . at trial demonstrating that [he] was 'infected' with a venereal disease during his sexual interactions with Faith."  Kelly Br. at 61.  Because Kelly's conduct falls within the core of the conduct prohibited by section 2307, and a person of ordinary intelligence in his position would understand what "infected" means under that section, we reject his vagueness challenge.

Section 2307 provides that "[a]ny person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor."  N.Y. Pub. Health Law § 2307.  Kelly argues that he was not "infected" within the meaning of section 2307 because "infected" must be interpreted to mean "active infection to avoid constitutional concerns."  Kelly Br. at 62.  Because he was not experiencing an active herpes outbreak when he had sex with Faith, Kelly claims that the government did not prove a violation of the statute.  He also argues that the provision is unconstitutionally vague because it effectively prohibits individuals with venereal diseases from having consensual sex.

"Our analysis begins, as it must, with the plain text." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022). Absent a definition in the statute, we must give "infected" its ordinary meaning when interpreting section 2307. *See Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms." (citation omitted)).

A person is "infected" when he or she "[c]ontain[s] or carr[ies] (a source of) infection." *Infected*, *Oxford English Dictionary* (2012); *see also Infect*, *Black's Law Dictionary* (12th ed. 2024) (defining "infect" as "[t]o contaminate"). Kelly's contention that a person is "infected" only when he or she is experiencing an active outbreak of some disease or virus strains credulity. To limit the definition of "infected" to active outbreaks would contravene the plain language of "infected" and its commonly understood definition. *See Infected*, Merriam-Webster, https://www.merriam-webster.com/dictionary/infected [https://perma.cc/85XF-HJ62] (last visited July 12, 2024) ("[to be] contaminated with an infective agent (such as a bacterium or virus)"). It would also contravene the statute's purpose, which is designed to protect sexual partners of people who know that they are infected with a virus but might not be obviously infected.

51

The evidence at trial established that genital herpes is an STD spread by engaging in sexual acts with an infected person, regardless of whether the person is experiencing an outbreak. Once transmitted, the virus stays in an infected person's nervous system forever, and though it can lay dormant for periods of time, the person can still infect others with the virus.

Kelly also argues that he was not on notice that he was infected, but this argument is meritless considering the evidence at trial that established that Kelly was diagnosed with herpes and was aware of his diagnosis. The remainder of Kelly's vagueness challenge appears to be a facial challenge, which we must reject because section 2307 does not implicate First Amendment rights, and Kelly has not come close to meeting his burden of showing that there is no constitutional application of the statute. *Salerno*, 481 U.S. at 745.

Kelly purports to invoke the due process rights of the "millions of individuals" who have herpes, and against whom enforcement of the statute may be unconstitutional. Kelly Br. at 65. But because we treat this as an as-applied challenge, Kelly's invocation of the rights of others whose conduct falls at the outer bounds of section 2307 fails. *See Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006) (explaining that "[f]ederal courts as a general rule" do not allow litigants to

assert "the legal rights and interests of third parties").  Kelly's conduct falls

comfortably within section 2307's reach: he knew he had a highly contagious,

incurable STD, and he knowingly had unprotected sex with multiple women,

including Faith, without disclosing his condition, thus exposing them to the virus

without their knowledge.  Kelly's vagueness challenge fails.

### C.    *California Health and Safety Code § 120290*

As to CHSC § 120290, Kelly argues he was improperly charged

under a now-repealed version of the statute and that the repealed version is

unconstitutionally vague.  Because this objection was not properly raised in the

district court, it was forfeited and we do not reach its merits.

#### 1.    *Applicable Law*

The version of CHSC § 120290 in effect at the time of the conduct

charged in the indictment (between April and May 2015) provided:

> [A]ny person afflicted with any contagious, infectious, or
> communicable disease who willfully exposes himself or herself to
> another person, and any person who willfully exposes another
> person afflicted with the disease to someone else, is guilty of a
> misdemeanor.

Cal. Health & Safety Code § 120290 (1998).[10]

   2. *Application*

   The government argues that Kelly's claim that he was improperly

charged under the 1998 version of section 120290 is untimely under Federal Rule

of Criminal Procedure 12(c)(3) and is also meritless.

   We agree as to timeliness.  Federal Rule of Criminal Procedure

12(b)(3)(B) provides that a defect in the indictment "must be raised by pretrial

motion if the basis for the motion is then reasonably available and the motion can

be determined without a trial on the merits."  Here, the indictment made clear

that the government was charging Kelly under the 1998 version of CHSC

§ 120290 -- the version in effect at the time he engaged in the charged conduct.

But Kelly did not raise an objection to this use of the 1998 version until "several

weeks after trial had commenced."  Gov't Br. at 88.  Indeed, trial commenced on

---

[10] The current version of section 120290, which took effect on January 1, 2018, provides that a person is guilty of intentional transmission of an infectious or communicable disease if:

> The defendant knows that he or she . . . is afflicted with an infectious or communicable disease[,] . . . acts with the specific intent to transmit . . . that disease to another person[,] . . . engages in conduct that poses a substantial risk of transmission to that person[, and actually] transmits the infectious or communicable disease to the other person.

Cal. Health & Safety Code § 120290 (2018).

August 18, 2021, and Kelly did not raise the issue until September 18, 2021, in a letter to the court.  His challenge was therefore untimely under Rule 12(b)(3)(B).  *See United States v. O'Brien*, 926 F.3d 57, 82-85 (2d Cir. 2019) ("If a motion falling within Rule 12(b)(3) is not made before trial (or before such pretrial deadline as may be set by the court for such motions), it is 'untimely.'")

Moreover, Kelly did not explicitly object to the 1998 version of the statute used in the indictment.  Instead, he first raised the issue while trial was underway, when he submitted a letter requesting amendments to the proposed jury instructions.  In his letter, he observed that CHSC § 120290's text was different from the text provided (of the 1998 version) in the jury instruction but proposed no alternative language for use in the instruction.  The district court did not explicitly rule on the request but effectively denied it by using the 1998 version of CHSC § 120290 in the issued jury instructions.  Before trial, Kelly made no arguments with respect to an improper charge or a defect in the indictment, and he did not ask the court to dismiss the charge.  He also did not argue before trial that the 1998 version of the statute was unconstitutionally vague.  *See United States v. Crowley*, 236 F.3d 104, 109 (2d Cir. 2000) (finding that, because the defendant "failed to identify any terms in the indictment that were

55

too vague or general" in his *pretrial motion* to dismiss his indictment as vague, his motion was untimely and his objection was forfeited).  *But see* Fed. R. Crim. P. 12(c)(3) advisory committee's note to 2014 amendments ("New paragraph (c)(3) governs the review of untimely claims, previously addressed in Rule 12(e), . . . [which] provided that a party 'waives' a defense not raised within the time set under Rule 12(c). . . .  [Rule] 12(c)(3) retains the existing standard for untimely claims.  The party seeking relief must show 'good cause' for failure to raise a claim by the deadline, a flexible standard that requires consideration of all interests in the particular case.").  Because Kelly did not argue, much less demonstrate, good cause for failing to raise a pretrial challenge to his indictment, his argument, in addition to being untimely, was forfeited.  In light of this conclusion, we do not address the related merits arguments.

## III.    *Jury Selection*

Kelly argues he was denied a fair and impartial trial, contending that, after conducting *voir dire*, the district court empaneled four jurors who were biased against him.  He also brings an ineffective assistance of counsel claim against trial counsel for the purported failure to "conduct any meaningful *voir dire*" of those jurors.  Kelly Br. at 76-77.

56

### A. Standard of Review

"Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). "That is because the trial court, not unlike jurors later on in the trial, is best positioned to reach conclusions as to impartiality and credibility by relying on its own evaluations of demeanor evidence and of responses to questions." *United States v. Nieves*, 58 F.4th 623, 631 (2d Cir. 2023) (internal quotation marks omitted and alterations adopted). Accordingly, the district court enjoys "ample discretion in determining how best to conduct the *voir dire*," *Rosales-Lopez*, 451 U.S. at 189, and we will not reverse unless we determine that the district court abused its discretion, *see United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002).

When a defendant raises a claim for ineffective assistance of counsel on direct appeal, we may "(1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus . . . ; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." *United States v. Tarbell*, 728 F.3d 122, 128 (2d Cir. 2013) (quoting *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003)). The Supreme Court has instructed that a habeas petition is the preferable vehicle for

lodging an ineffective assistance claim, *see id.* at 128-29, but that we may decide the claims on the merits on direct appeal "when their resolution is beyond any doubt or to do so would be in the interest of justice," *United States v. Kimber*, 777 F.3d 553, 562 (2d Cir. 2015) (internal quotation marks omitted).

### B.   *Applicable Law*

#### 1.   *Impartial Jury*

"The Supreme Court has recognized that the voir dire process 'plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored.'" *Nieves*, 58 F.4th at 631 (quoting *Rosales-Lopez*, 451 U.S. at 188).  "An impartial jury is one 'capable and willing to decide the case solely on the evidence before it,'" *United States v. Perez*, 387 F.3d 201, 204 (2d Cir. 2004) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)), and "[t]rying an accused before a jury that is actually biased violates even the most minimal standards of due process," *United States v. Nelson*, 277 F.3d 164, 206 (2d Cir. 2002).

Although a district court enjoys broad discretion in conducting *voir dire*, it must, at a minimum, "remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence." *Rosales-*

*Lopez*, 451 U.S. at 188; *accord United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989) ("[T]he defense deserves 'a full and fair opportunity to expose bias or prejudice on the part of veniremen.'" (quoting *United States v. Barnes*, 604 F.2d 121, 139 (2d Cir. 1979))).

"[T]here must be sufficient factfinding at voir dire to allow for facts probative of any of these forms of bias to reveal themselves. Otherwise, fundamental unfairness arises if voir dire is not adequate to identify unqualified jurors." *Nieves*, 58 F.4th at 633 (internal quotation marks omitted and alterations adopted).

For *voir dire* to be so insufficient as to call for reversal,

> the record viewed as a whole must show either: (i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style; (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial . . . ; or (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question.

*Lawes*, 292 F.3d at 129 (citations omitted).

59

2.    *Ineffective Assistance of Counsel*

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness, and (2) the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). For prejudice, a defendant must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**C.    Application**

We have examined the record and conclude that none of the jurors whom Kelly challenges on appeal were improperly empaneled. For that reason, the resolution of Kelly's ineffective assistance of counsel claim is "beyond any doubt," and resolving the claim on appeal is "in the interest of justice." *Kimber*, 777 F.3d at 562.

Kelly contends that Jurors 3, 4, 5, and 12 could not be fair and impartial toward him because of their personal knowledge of his case, their consumption of media about his alleged crimes, and their opinions on STDs. He claims it was reversible error for the district court to empanel them despite their

answers to the written questionnaire and their responses during in-person *voir dire*.

We are not persuaded. The district court conducted extensive *voir dire*, beginning with a questionnaire containing 108 questions that went to a pool of approximately 575 prospective jurors and from which 251 were dismissed for cause based on their answers. *Kelly*, 609 F. Supp. 3d at 107. Kelly's counsel then submitted the names of 145 additional prospective jurors whom they challenged on his behalf; the government submitted a list of an additional 34. These individuals were excused prior to *voir dire*. *Id.* at 107 n.8. The district court also directed the parties to submit any additional questions they wanted for in-person *voir dire*. *Id.* at 107-08. The district court then conducted in-person *voir dire* of the approximately 145 remaining prospective jurors, a process that spanned two days. *Id.* at 107 n.8, 108. During in-person *voir dire*, the district court addressed the prospective jurors as a group and explained basic principles of law, including the presumption of innocence. *Id.* at 108. The district court then questioned the prospective jurors individually, asking about their answers to the written questions and soliciting additional questions from the parties. *Id.*

Bearing in mind the district court's substantial discretion in conducting *voir dire* and the other principles articulated above, we find no reversible error here in the empaneling of Jurors 3, 4, 5, and 12. The record indicates that each juror was subject to thorough questioning by the district judge during in-person *voir dire*. The district court determined, based on that questioning and after giving each side an opportunity to request further questioning, that each juror could be impartial when deciding the case.

The following discussion with Juror 3 is reflective of the exchanges with all four jurors. In response to a question in the questionnaire asking prospective jurors if they had "read, seen or heard anything about the case, the alleged crimes, or people involved," Juror 3 (Prospective Juror 25) answered, "I saw the documentary, [but] I forgot the name of it." Sealed App'x at 183. The questionnaire also asked prospective jurors if they had "read, seen, or heard about Robert Kelly, also known as 'R. Kelly.'" *Id.* Juror 3 marked the box for "Yes," and wrote, "Entertainer, I heard that he has been sleeping with underage girls." *Id.* Finally, in response to another question, Juror 3 wrote, "I saw a documentary about [Kelly] and his legal troubles. I don't know the full story, so I have no feelings about it. I remain impartial." *Id.*

During in-person *voir dire*, the district judge and Juror 3 had the following exchange:

> THE COURT: Mr. Kelly is presumed innocent and it is the Government that has the burden of proving his guilt beyond a reasonable doubt. If you are selected as a juror I will explain what those terms mean in more detail but is there any reason you can't follow that instruction?
>
> PROSPECTIVE JUROR: No reason at all.
>
> […]
>
> THE COURT: Is there any reason at all why you wouldn't be able to give both sides a fair trial?
>
> PROSPECTIVE JUROR: No.

Gov't App'x at 389-90. Following this exchange, defense counsel did not have any other requests. Neither party exercised any challenges to excuse Juror 3, who was seated on the jury. We agree with the district court that "none of the challenges the defendant asserts on appeal would have warranted granting a challenge for cause." *Kelly*, 609 F. Supp. 3d at 152.

These circumstances are nothing like the *voir dire* we found lacking in *Nieves*, where the district court merely "explained several foundational trial concepts" and asked just three or four demographic questions during individualized *voir dire*. 58 F.4th at 629. We are satisfied that the district court here, through its lengthy questionnaire and three-day in-person *voir dire* process,

elicited more than "sufficient information . . . to permit [Kelly] to intelligently exercise" his for-cause and peremptory challenges. *Id.* at 633 (quoting *Colombo*, 869 F.2d at 151). The record also illustrates that all four now-challenged jurors represented to the district court that they could be fair and impartial, follow the presumption of innocence, and hold the government to its burden of proof -- and that anything they had heard or read about the case would not impair their fairness. The trial court accepted these representations, and it did not abuse its discretion in doing so.

Kelly also cannot meet his burden of showing that counsel's performance was so deficient during *voir dire* that counsel was ineffective. The record shows that counsel's performance did not fall below an objective standard of reasonableness. Indeed, trial counsel actively participated throughout *voir dire*. Counsel made several successful for-cause challenges over the government's objection. *See, e.g.*, Gov't App'x at 455-61 (defense counsel successfully persuaded the district court to dismiss a prospective juror who, as a supporter of the #MeToo movement, stated that she believed that "in most cases women don't lie" about allegations of sexual assault). Kelly therefore cannot

meet the requirements of *Strickland* because he cannot show that counsel

performed unreasonably during *voir dire*.

## IV.     *The Rule 404(b) Evidence*

Kelly challenges several of the district court's evidentiary rulings,

arguing that "[w]ith virtually no limitation, the district court permitted the

prosecution to inundate the jury with excessive bad act evidence, mostly under

the theory that the evidence was relevant to the 'means and method' of the

enterprise."  Kelly Br. at 87.  We consider the admissibility of four sets of

evidence: (1) evidence that Kelly exposed other women to herpes, offered to

establish Kelly's knowledge of his diagnosis and to corroborate other testimony

that it was his practice to have unprotected sex; (2) the testimony of an alleged

victim of Kelly's uncharged conduct that she saw Kelly performing oral sex on

Aaliyah, offered to prove Kelly's motive to obtain false identification for Aaliyah;

(3) testimony from alleged victims of Kelly's uncharged conduct regarding his

sexual contact with them, offered as evidence of the enterprise's "means and

methods"; and (4) video recordings by Kelly of his sexual activity, offered as

evidence of Kelly's practice of recording his sexual encounters and as evidence of the enterprise's means and methods.

## A.    *Standard of Review*

We review a district court's evidentiary rulings for abuse of discretion and "will disturb an evidentiary ruling only where the decision to admit or exclude evidence was 'manifestly erroneous.'" *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018) (quoting *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015)).  "To find such abuse [of discretion], we must conclude that the trial judge's evidentiary rulings were 'arbitrary and irrational.'" *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006) (quoting *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001)).  Even if an evidentiary ruling is manifestly erroneous, we will affirm -- and the defendant is not entitled to a new trial -- if the error was harmless.  *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012).

"We accord great deference to a district court in ruling as to the relevancy and unfair prejudice of proffered evidence, mindful that it 'sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence.'" *Paulino*, 445 F.3d at 217 (quoting *Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998)).  "When reviewing a

district court's Rule 403 determination, we 'generally maximize the evidence's probative value and minimize its prejudicial effect.'" *United States v. McPartland*, 81 F.4th 101, 114 (2d Cir. 2023) (alteration adopted) (quoting *United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004)).

### B.    *Applicable Law*

Rule 404(b) of the Federal Rules of Evidence governs the admissibility of "other acts" -- "[c]rimes, [w]rongs, or [a]cts" other than those charged.  Fed. R. Evid. 404(b).  Evidence of other acts is not admissible if offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  *Id.* 404(b)(1).  Such evidence may be admissible, however, if offered "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *Id.* 404(b)(2).

This Court takes an "inclusionary" approach to Rule 404(b), under which all "other act" evidence that does not serve the sole purpose of showing the defendant's bad character is admissible, subject to Rule 402's and Rule 403's respective relevance and prejudice considerations.  *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996); *see also United States v. Robinson*, 702 F.3d 22, 37 (2d Cir.

2012) (explaining that evidence of uncharged criminal conduct that "is

inextricably intertwined with the evidence regarding the charged offense, or . . .

necessary to complete the story of the crime on trial" is not generally considered

to be evidence of other acts governed by Rule 404(b) at all).

"To determine whether a district court properly admitted other act

evidence," we consider "whether (1) it was offered for a proper purpose; (2) it

was relevant to a material issue in dispute; (3) its probative value is substantially

outweighed by its prejudicial effect; and (4) the trial court gave an appropriate

limiting instruction to the jury if so requested by the defendant." *LaFlam*, 369

F.3d at 156.

Even if evidence is admissible under Rule 404(b), it must still pass

the balancing test set forth in Rule 403. *See United States v. Scott*, 677 F.3d 72, 83

(2d Cir. 2012). In other words, the probative value must not be "substantially

outweigh[ed] by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence." Fed. R. Evid. 403.

C.     *Application*

To the extent that evidence was "inextricably intertwined" with the evidence of the RICO conspiracy and of the charged conduct, it falls outside the scope of Rule 404(b).  Even so, each challenged category of evidence would also be admissible under that Rule, as we now explain.

1.     *The Evidence of Herpes*

Kelly first contends that the district court abused its discretion when it admitted "massive amounts of evidence" that Kelly exposed others to herpes and transmitted it to them.  Kelly Br. at 90.  We disagree.

It was neither arbitrary nor irrational for the district court to admit evidence that Kelly transmitted herpes to others.  Kelly argues that the evidence was excessive and unduly prejudicial considering Dr. McGrath's "unequivocal[]" testimony that Kelly was diagnosed with and receiving treatment for herpes.  *Id.* at 91.  But as the government points out and the district court noted, evidence that Kelly transmitted herpes to several other women -- one of whom told Kelly that she had contracted the disease, and another of whom was with Kelly, in his home, when she received her diagnosis -- was directly probative of Kelly's knowledge of his diagnosis, which the government was required to establish to

prove Racketeering Acts 8, 12, and 14, as well as Counts 6 through 9.  This

evidence was relevant and probative especially because defense counsel did not

stipulate that Kelly knew he had herpes.  *See Kelly*, 609 F. Supp. 3d at 160.  The

use of this evidence falls squarely within Rule 404(b)'s proper purposes.

Furthermore, we cannot say that the district court abused its discretion in

balancing the probative value and prejudice of this evidence, especially

considering that Kelly put his knowledge of his herpes diagnosis at issue and the

government was entitled to refute that assertion.

2.    *Angela's Testimony About Aaliyah*

We also conclude that the district court did not abuse its discretion

when it allowed Angela to testify about seeing Kelly perform oral sex on

Aaliyah.  This testimony was admissible because it was probative of Kelly's

motive to bribe local officials to fabricate identification for Aaliyah (Racketeering

Act 1).  The testimony was especially relevant to establish that Kelly and Aaliyah

had a sexual relationship in the first place, given defense counsel's refusal to

concede that fact.  The probative value of Angela's testimony was not

substantially outweighed by unfair prejudice to Kelly, because the testimony

about Kelly's sexual relationship with Aaliyah was not "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999).

### 3. Other Victim Testimony

We are also unpersuaded by Kelly's argument that the testimony of other witnesses -- Addie, Alexis, Kate, Anna, Angela, Louis, and Alex -- was cumulative and unduly prejudicial because none of the listed individuals were associated with any of the charges. The district court acted within its discretion when it admitted the testimony. The testimony of the witnesses, who were all minors at the time their abusive relationships with Kelly began, is evidence that Kelly's behavior toward the charged victims was part of a pattern. *See United States v. Pizzonia*, 577 F.3d 455, 465 (2d Cir. 2009) ("[T]o demonstrate a pattern of racketeering, . . . it is not the number of predicates proved but, rather, 'the relationship that they bear to each other or to some external organizing principle' that indicates whether they manifest the continuity required to prove a pattern." (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989))).

"It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise." *United States v. Baez*, 349 F.3d 90, 93 (2d Cir.

2003); *see also United States v. Mejia*, 545 F.3d 179, 206 (2d Cir. 2008) ("Where . . .

the existence of a racketeering enterprise is at issue, evidence of uncharged

crimes committed by members of that enterprise, including evidence of

uncharged crimes committed by the defendants themselves, is admissible to

prove an essential element of the RICO crimes charged—the existence of a

criminal enterprise in which the defendants participated." (internal quotation

marks omitted)).  Indeed, the admissibility of such evidence is not governed by

Rule 404(b) at all because it is direct evidence of the charged conduct.  *See United*

*States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997).  Likewise, we have noted that

"evidence beyond a defendant's own predicate acts—whether alleged or not—is

relevant to establishing a charged pattern of racketeering." *United States v.*

*Basciano*, 599 F.3d 184, 206 (2d Cir. 2010).  Therefore, we do not hesitate to

conclude that the government may introduce evidence of uncharged conduct to

establish a pattern of racketeering activity and that the admissibility of such

evidence is not governed by Rule 404(b).

      With respect to Kelly's Rule 403 challenge, none of the testimony

was more inflammatory than the charged acts.  As a result, we cannot say that

the district court abused its discretion in admitting the testimony of the other

victims.

4.    *The Video Evidence*

Finally, three of the government's exhibits were videos that Kelly

made of his sexual encounters with multiple victims: (1) a recording of Kelly

directing two victims to engage in oral sex; (2) a recording of Kelly spanking a

victim, who was crying and robotically calling herself a "slut" and "stupid"; and

(3) a recording of a victim covering her naked body in feces.  Kelly argues that

these videos were unfairly prejudicial and not probative.  The videos, however,

were properly admitted to show the means and methods of the enterprise,

including the level of control and dominance Kelly had over his victims.  The

videos demonstrated Kelly "[d]emanding absolute commitment . . . and not

tolerating dissent," and "[c]reating embarrassing and degrading videos of sexual

partners to maintain control over them," Gov't App'x at 22 ¶ 9(b), (d), which

were charged means and methods of the RICO enterprise.  The feces video

corroborated Jane's testimony that Kelly similarly directed her to eat feces as

punishment, which is relevant to Kelly's level of control over Jane and whether

he coerced her to travel to have sex with him in violation of the Mann Act.  The

district court did not abuse its discretion in admitting this evidence.

## V.    *Monetary Awards*

### A.    *Restitution*

Kelly challenges the district court's award of restitution to two victims and its directive to the BOP to seize funds in his inmate trust account. He does so on three grounds: (1) the government failed to prove that Jane's and Stephanie's herpes diagnoses were attributable to him, (2) the government failed to prove that Jane or Stephanie required a suppressive rather than ad-hoc or occasional herpes treatment regimen, and (3) the government failed to prove that Jane or Stephanie required name-brand Valtrex over the generic, and less expensive, valacyclovir.

After the initial hearing, the government requested restitution, as relevant to this appeal: (1) $357,218.18 for Jane pursuant to 18 U.S.C. § 2429 and § 3663 for genital herpes-related medical expenses, therapy costs, and lost income; and (2) $78,981.72 to Stephanie pursuant to 18 U.S.C. § 3663 for genital herpes-related medical expenses and therapy costs. Kelly opposed the government's requests.

At the restitution hearing, the district court imposed $300,668.18 in restitution for Jane ($281,168.18 for herpes treatment and $19,500 for three and three-quarters' years of therapy) and $8,200 for Stephanie's past therapy expenses. The district court concluded that Kelly owed Stephanie restitution for her herpes-related medical expenses, but deferred decision on the amount, subject to further clarification from the government as to whether Stephanie was treating her herpes with Valtrex or valacyclovir, the generic, less expensive version of the drug.

On October 5, 2022, the government submitted revised calculations for Stephanie, seeking $45,587.20 in restitution for Stephanie's herpes treatment expenses. In an order dated November 8, 2022, the district court imposed $70,581.72 in restitution for Stephanie for her herpes treatment and $8,400 as compensation for past therapy costs.

1.    *Standard of Review*

Our review of a district court's restitution order is deferential, and we will reverse only for abuse of discretion. *United States v. Afriyie*, 27 F.4th 161, 173 (2d Cir. 2022). Questions of law raised by challenges to restitution orders are

reviewed *de novo*, while factual questions are reviewed for clear error. *United States v. Reifler*, 446 F.3d 65, 120 (2d Cir. 2006).

### 2. *Applicable Law*

"Federal courts have no inherent power to order restitution." *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012). "A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by, statute." *Id.* There are two restitution statutes relevant to this appeal: 18 U.S.C. § 2429 and 18 U.S.C. § 3663.

Section 2429 is the mandatory restitution provision for Mann Act violations. A court "shall order" restitution to victims of Mann Act offenses in the "full amount of the victim's losses." 18 U.S.C. § 2429(a), (b)(1). "Victim" means "the individual harmed as a result of a crime under this chapter." *Id.* § 2429(d). The "full amount of the victim's losses" is defined as including:

> [A]ny costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim . . . including -- (A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) reasonable attorneys' fees, as well as other costs incurred; and (F) any other relevant losses incurred by the victim.

*Id.* § 2259(c)(2).[11]

Section 3663 is the Victim and Witness Protection Act and permits a sentencing court to order that the defendant make restitution to any victim of an offense under Title 18. *Id.* § 3663(a)(1)(A). Under that statute, restitution is not mandatory, but "the purpose of [§ 3663] is to require restitution whenever possible." *United States v. Porter*, 41 F.3d 68, 70 (2d Cir. 1994). A "victim" is

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2).

Under § 3663, a court may require a defendant to

> (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment; (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and (C) reimburse the victim for income lost by such victim as a result of such offense.

---

[11]    Section 2429(b)(3) states that the term "'full amount of the victim's losses' has the same meaning as provided in section 2259(b)(3)." But the cross-reference is erroneous, because 18 U.S.C. § 2259(b)(3) deals with enforcement, not the amount of a victim's losses. The parties and we agree that § 2259(c)(2) now provides the applicable definition.

*Id.* § 3663(b)(2).

The government bears the burden of proving the amount of restitution sought, and "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." *Id.* § 3664(e). And while we require restitution awards to "be tied to the victim's actual, provable, loss," *Zangari*, 677 F.3d at 91, the amount of restitution need only reflect a "reasonable approximation of losses supported by a sound methodology," *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013).

    3. *Application*

        *a. Jane*

Kelly contends that the district court abused its discretion in ordering restitution as to Jane because in his view the government did not meet its burden of establishing that (1) Jane was infected with herpes as a result of the charged conduct; (2) Jane is being treated with a suppressive regimen of Valtrex; and (3) Jane will actually treat her herpes with Valtrex rather than the cheaper generic, valacyclovir. We disagree.

First, we find that the government met its burden of proving that Jane was infected with herpes as a result of the charged conduct, specifically his

violation of the Mann Act as to Jane.  The district court did not abuse its

discretion in determining that Kelly's Mann Act conduct was sufficiently

connected to Jane's harm.  Jane testified that she contracted herpes when she was

seventeen and during her relationship with Kelly.  She also told Kelly that she

had been intimate with only him.  From this evidence, and the ample evidence

that Kelly had herpes, we cannot say that the district court's conclusion that Jane

is a victim entitled to mandatory restitution rests on a clearly erroneous view of

the facts or on legal error.

Turning to Kelly's second and third objections, we also conclude that

the district court acted within its discretion in ordering Jane restitution in an

amount to cover a suppressive regimen of Valtrex.  While we agree that

restitution for losses must be grounded in some reasonable approximation and

not mere conjecture or speculation, *see United States v. Maynard*, 743 F.3d 374, 378

(2d Cir. 2014), we decline Kelly's invitation to undo the experienced district

judge's careful rulings after briefing and a thorough restitution hearing.  We

agree that the government proved the victim's loss by a preponderance of the

evidence, and, given the broad remedial measures of the restitution statute, the

district court reasonably ordered a suppressive regimen to keep Jane "in an outbreak-free state to the extent possible."  Gov't Br. at 125.

      We are also satisfied that the district court acted within its discretion in ordering restitution based on the cost of a name-brand rather than a generic drug.  Covering Jane's costs for a name-brand drug does not give her a windfall.[12]  Here, Jane would not have had to purchase herpes medication if Kelly had not infected her with the virus.  And like the district court, we are not aware of any authority requiring the victim to "pursue the cheapest option to minimize a defendant's restitution expenses."  Sp. App'x at 177.  Moreover, the record indicates that both Jane and Kelly were being treated with Valtrex at the time.[13]

---

[12]    In *Maynard*, cited by Kelly, we held that a district court's restitution order gave the victim an improper windfall.  743 F.3d at 379-80.  There, a bank had been robbed, and the district court ordered restitution to cover the employees' salaries for two days of paid time off that the bank had given them to recover from robbery-related stress.  *Id.*  We noted that, because the bank would have had to pay the employees for these two days even if it had not been robbed, the order of restitution to cover the salaries constituted a windfall.  *Id.*

[13]    Additionally, because there was no evidence here suggesting that Jane would or should be treated with the generic drug instead of Valtrex, we disagree with the dissent's suggestion that the district court abused its discretion in awarding damages in the amount of the cost of the brand-name drug.  Although generics and brand-name drugs are often identical, "[companies] aren't required to show that the two versions are therapeutically equivalent, meaning that they don't have to do tests to make sure that patients respond to these drugs the same way they do the brand-name version."  Staying Healthy, *Do Generic Drugs Compromise on Quality?*, Harv. Health Publ'g (February 12, 2021), https://www.health.harvard.edu/staying-healthy/do-generic-

b.      *Stephanie*

As to Stephanie, Kelly argues that there is no evidence that

Stephanie contracted herpes from Kelly because his medical records confirm that

he tested negative for herpes in June 2000, and Stephanie claims that she

contracted herpes in 1999.  He also argues that the district court abused its

discretion by inflating the amount of restitution that it awarded her.

We agree that Stephanie presents a closer question because of the

timing of her herpes diagnosis.  And based on our review of the record and the

trial transcripts below, we note that Stephanie did not testify about herpes at trial

-- the evidence of her infection comes from materials submitted for sentencing.

We nevertheless conclude that the district court did not abuse its discretion in

determining that the government met its burden of proving that Stephanie was a

victim by a preponderance of the evidence.  At trial, Dr. McGrath testified that

herpes tests can yield false negatives, and that Kelly's June 2000 test was "not

---

drugs-compromise-on-quality [https://perma.cc/26DP-M8BU].  There have also been repeated
reports of generic drugs found to contain contaminants, including carcinogens, and reported
difficulties faced by the FDA when attempting to inspect drug manufacturing facilities located
overseas, as many generic manufacturers are.  *E.g.*, Arthur L. Kellermann, *FDA Pushes Back on
Calls for Safety Tests of Generic Drugs*, Forbes (Jan. 10, 2024), https://www.forbes.com/sites/
arthurkellermann/2024/01/10/we-should-test-generic-drugs-to-assure-safety-the-fda-hates-the-
idea/ [https://perma.cc/TM76-H2WE]; Daniel A. Hussar, *Is the Quality of Generic Drugs Cause for
Concern?* 26 J. Managed Care & Specialty Pharm. 597 (2020).

conclusive." Kelly App'x at 373. And in light of Stephanie's testimony that she had a sexual relationship with Kelly when she was seventeen years old for about six months and her prior statements that she was not having sexual relations with anyone else at the time, we are satisfied that the government has met its burden in this respect.

Our analysis as to Kelly's challenge to the amount of restitution awarded Stephanie mirrors our analysis as to Jane. The district court's order of restitution was based on the government's reasonable approximation of Stephanie's losses. We therefore affirm the district court's restitution order in all respects.

### B.    *The Seizure of Funds*

On August 4, 2022, the BOP seized approximately $27,000 from Kelly's inmate trust account upon the direction of the government. The government then sought an order from the district court directing the BOP to turn over the seized money to the Clerk of Court for deposit in an interest-bearing account pending a restitution determination. The district court granted the order.

Kelly challenges this, arguing that the district court lacked authority to authorize the turnover because Kelly was not in default on any fines and was not provided with any notice of default. He contends that there is no authority "for the proposition that the government may restrain [his] property preemptively for use against a future restitution award that has yet to be entered." Kelly Br. at 105. He also argues that the "government acted prematurely and without legal authority when it ordered the BOP to seize [his] monies from his trust account absent any showing that [he] defaulted." *Id.* at 106.

     1.   *Applicable Law*

Under the Mandatory Victims Restitution Act (the "MVRA"), "a judgment imposing a fine may be enforced against all property or rights to property of the person fined." 18 U.S.C. § 3613(a). A fine, assessment, or restitution order imposed under certain statutes acts as a lien in favor of the government on "all property and rights to property" of the defendant. *Id.* § 3613(c). Under the MVRA, "[i]f a person obligated to provide restitution, or pay a fine, receives substantial resources from any source . . . during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed." *Id.* § 3664(n). "The MVRA expressly states

83

that criminal restitution orders may be enforced against *all* property or rights to property, making quite clear that absent an express exemption, all of a defendant's assets are subject to a restitution order." *United States v. Shkreli*, 47 F.4th 65, 71 (2d Cir. 2022) (citation and internal quotation marks omitted), *cert. denied sub nom. Greebel v. United States*, 143 S. Ct. 2560 (2023) (mem.).

## 2.    *Application*

As explained above, a judgment imposing a fine or restitution is a lien on all property and rights to property of the person fined.  18 U.S.C. § 3613(c).  While Kelly makes much of the fact that his BOP funds were seized before an order of restitution was entered, he ignores that the government sought these funds "either to satisfy [Kelly's] restitution judgment, which [was] yet to be imposed, *or* to satisfy the Court-ordered fine, which ha[d] already been imposed."  Sp. App'x at 161 (emphasis added) (internal quotation marks omitted).  Indeed, the district court had already ordered a $100,000 fine, $900 special assessment, and $40,000 assessment under the Justice for Victims of Trafficking Act, which well exceeded the approximately $27,000 in Kelly's BOP account.  Because Kelly's BOP funds are not exempt from seizure under 18 U.S.C.

§ 3613(a), the district court acted within its discretion in ordering Kelly's BOP

funds be seized to pay outstanding restitution and fines.  We see no error here.

## CONCLUSION

We have considered all the arguments presented by Kelly on appeal

and concluded they are without merit.  For the reasons set forth above, we

AFFIRM the district court's judgment.